**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EVA-PIA REICH, | |
| Plaintiff, | |
| v. | Civil Action No. 07-1508 (KSH) |
| SCHERING CORP., | **OPINION** |
| Defendant. | |

**KATHARINE S. HAYDEN, U.S.D.J.**

## I.   INTRODUCTION

In this employment discrimination lawsuit, plaintiff Dr. Eva-Pia Reich ("Reich"), a scientist, is suing her former employer, defendant Schering-Plough Corporation ("Schering"), under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1.  Reich claims Schering continuously discriminated against her on the basis of age during her employment at the company.  According to Reich's complaint, Schering unlawfully terminated Reich's employment one month after she filed a discrimination complaint with the New Jersey Division on Civil Rights.

Before this Court is defendant's motion for summary judgment.  The Court's federal question jurisdiction is undisputed and proper pursuant to 28 U.S.C. § 1331, and the Court's

1

supplemental jurisdiction over plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367. Venue is also undisputed and proper pursuant to 28 U.S.C. § 1391(b).

## II.   FACTUAL BACKGROUND

Schering, through its operating division Schering-Plough Research Institute ("SPRI"), researches and develops pharmaceutical products.  (Cert. of Jay S. Fine ("Fine Cert.") ¶ 2.)  In June 1999, Schering hired Reich, then 55 years old, as a Principal Scientist Biological Researcher, charged with conducting drug discovery research in the Inflammation Department. (Cert. of Megan Burley ("Burley Cert.") ¶ 2.)  Reich had worked as a research scientist in both academic and corporate settings before being hired by Schering, but her scientific experience was different from the position for which Schering hired her.  (Reich Dep. 40:2-14, 44:19-22.)

Schering supervisors Dr. Paul Zavodny ("Zavodny") and Dr. Satwant Narula ("Narula") interviewed Reich for the position of Principal Scientist.  (*Id.* at 6:23-7:9.)  Reich reported directly to Zavodny, and then Zavodny reported to Narula.  (*Id.* at 58:11-15.)

While working under Zavodny's supervision, Reich performed both *in vivo* and *in vitro* experiments.[1]  (*Id.* at 52:3-19.)  Reich testified at her deposition that she and Zavodny had a good working relationship:

> Q. How would you describe your working relationship with Paul Zavodny?
> A. Good.  He was a good mentor and we had - - we met often.  He had an open door policy.  He trusted me in the work.  He gave big brush outlines of what needed and where the effort should be, and then [sic] he had complete confidence that I would carry out experiments and design the bench work and get it done to him in time.

(*Id.* at 54:2-10.)

---

[1] Plaintiff explains in her deposition that *in vivo* experiments are conducted on live animals, whereas *in vitro* experiments are carried out in a tissue culture or other artificial condition. (Reich Dep. 52:6-10.)

Reich testified that Zavodny was not trained as an *in vivo* biologist:

> Q. Do you know the extent of his experience in the in vivo area, in testing of live animals?  Do you know if he had experience in that?
> A. He had never done that hands-on work as a scientist when he was training.  That wasn't his background.  But clearly, it was used in his group by people, so he was familiar with and knew when to apply it.

(*Id.* at 54:11-20.)  Narula testified that because Zavodny was not trained as an *in vivo* biologist, his ability to "really understand in depth the work that [plaintiff] was doing" was limited. (Narula Dep. 38:13-14.)   It is not in dispute that Zavodny rarely provided constructive recommendations to Reich, and he generally gave her positive appraisals.  (Reich Dep. 57:6-58:9.)

In March 2004, when Reich was 59 years old, Jay Fine ("Fine"), age 42, replaced Zavodny as her immediate supervisor.  (*Id.* at 53:14-18.)  Unlike Zavody, Fine had expertise in *in vivo* biology and immunology.  (Narula Dep. 39:11-12.)  Reich disagrees to a certain extent on this point, stating in her deposition that she did not think Fine had performed *in vivo* biology, but that he had some experience with *in vitro*.  (Reich Dep. 100:13-24.)

It is undisputed that Reich and Fine had a good working relationship prior to and immediately following his becoming her supervisor.  (*Id.* at 83:16-84:16.)  They met weekly to discuss Reich's progress and scientific experiments, and communicated via e-mail and in group meetings.  (*Id.* at 96:24-97:24, Fine Dep. 67:11-13, 67:19-68:8, 151:8-152:8.)  According to Narula, due to Fine's expertise in *in vivo* biology and immunology, he was better able to evaluate Reich's performance critically than was Zavodny.  (Narula Dep. 39:11-14.)

Both parties acknowledge the significance of the company's restructuring in the midst of the events leading up to the alleged discrimination.  In 2003, Schering appointed Fred Hassan ("Hassan") as the new CEO, and the company underwent a series of corporate changes.  (*Id.* at

3

34:21-35:7, 36:24-37:4, 39:22-41:14, 42:19-43:1.) Fine was questioned during his deposition about Hassan's appointment and what it signified:

> Q. Have you heard the phrase "The New Schering-Plough"?
> A. Yes.
> Q. And was that a phrase that began to be used in conjunction with Mr. Hassan coming into the company?
> A. Yes.

(Fine Dep. 17:20-25.)

In May 2004, Schering implemented a company-wide initiative known as the Performance Management Program ("PMP"). (Burley Cert. ¶ 3.) Hassan sent a company-wide e-mail announcing to all employees that the PMP was a "transformational change" in how Schering would "develop, assess and reward" its employees. (*Id.*, Exh. B at 1.) "[T]he previous system tended to suffer from 'ratings inflation' that made many ratings meaningless. Our new system is different." (Parliman Cert., Exh. H.) Reich acknowledges that the PMP raised the bar in terms of performance standards for employees. (Reich Dep. 102:3-10.)

Under the new system, managers met with employees at the beginning of each year to set performance objectives and to discuss the employee's strengths and areas for improvement. (Parliman Cert., Exh. I at 10.) Managers formally evaluated employees on the basis of both these performance objectives as well as company-wide performance. (*Id.* at 10-12, 14.) The new system of evaluation was communicated to employees, both verbally and in writing, during a three-hour "core workshop" program. (*Id.* at 2.)

Under the PMP, employees were evaluated twice a year—during a mid-year and year-end review. (*Id.* at 10.) Managers evaluated employees under a five-tier rating system: EX for "exceptional"; EE for "exceeds expectations"; AE for "at expectations"; BE for "below expectations"; and U for "unacceptable." (*Id.* at 11.) Each employee was assigned a rating after

4

the managers in his/her department met with each other, and their own supervisors, as well as Human Resources, to determine how that employee compared to his/her peers and to the established performance benchmarks.  (Narula Dep. 35:8-17, 36:2-23.)

Directional ratings guidelines created a curved distribution for what percentage of employees company-wide could be rated in each of the five categories.  The majority of employees (50-55%) received an "At Expectations" directional rating.  (Parliman Cert., Exh. I at 12).  Schering communicated to employees that an "At Expectations" rating was a positive rating, albeit not at the high end of the more competitive ratings spectrum: "Colleague achieved key performance and development objectives and occasionally exceeded job requirements. Colleague displayed solid performance relative to others."  (*Id.* at 11.)

On August 18, 2004, Fine conducted Reich's mid-year PMP evaluation.  (Parliman Cert., Exh. S.)  This was the first review period under the new PMP for all Schering employees. (Burley Cert. ¶ 6.)  Fine completed a standard "performance & development review" form, as he was required to for each of the employees he supervised. (Parliman Cert., Exh. S.)  After completing the form, the new protocol required him and the employee to sit down together for a one-on-one meeting to discuss each section of the PMP evaluation.  (*Id.* at 1.)

Fine rated Reich as performing "At Expectations." (*Id.* at 1-7.)  Fine's evaluation provided suggestions for areas of improvement, including "cross functional team work and collaboration."  (*Id.* at 5.)  Fine's written evaluation further stated: "It will be critical for Pia [Reich] to develop productive unambiguous working relationships with all of the members of my group . . . . This is an area which has been inconsistent and occasionally has been contentious." (*Id.*)  Fine described Reich as "enthusiastically perform[ing]" studies and "willingly shar[ing] raw experimental data with colleagues."  (*Id.* at 2, 4.)

5

Fine, Narula, and Reich acknowledged and signed the 2004 mid-year PMP evaluation.

(*Id*. at 7.)  In the "colleague summary comments" column, Reich wrote:

> I am both dissatisfied and confused by my mid-year review rating and my managers [sic] summary comments.  I have successfully completed my goals.  My effort has been beyond what is expected of a Principal Scientist such as working continuously with no days off during the months:  January, March, May, June and July.

(*Id*. at 6.)  In an e-mail to himself—recollecting a follow-up discussion with Reich about her mid-year PMP—Fine stated that Reich made it clear that she believed she should have received an "Exceeds Expectations" rating.  (Parliman Cert., Exh. T.)  Fine wrote:

> This afternoon, I had a follow up discussion with Pia Reich regarding her midyear PMP . . . .  The discussion I had with Pia this afternoon, as part of our weekly 1:1 meeting, was to try to ensure that the basic message on the heightened expectations of the new process, the rationale for the decision made at the calibration meetings to give her a rating of AE, and to begin to seek a path forward to put Pia in the best position of being considered for an EE in the future.  Below I have attempted to summarize this discussion.

> Pia is extremely upset about the AE rating she received, feels that she was misled into thinking that her efforts this year to date warranted an EE, and has concerns about my knowledge of her efforts and my support of her . . . .  I explained that I cannot guarantee any ratings, that at best I can guide her to be in the best position to be considered for an EE rating, and that it is critical for Pia to "drive processes forward" by providing consistent and frequent scientific input which helps drive decision-making in programs, and to do so in a proactive manner, rather than relying on generating experimental data alone.  While this latter aspect is critical, it is expected that Principal Scientists such as Pia will be technically and experimentally adept and pro-active, and that it is the scientific input part of the equation that she appears to have "relinquished" . . . .

> In summary, Pia has concerns that I am not supportive of her, that she and I have distinctly different styles and approaches which she is trying to understand and work with, and that there are significant differences in expectations of her job function between her and me.  A significant reason for this difference, in my opinion, is carried over from the previous performance system and the managerial style of her previous supervisor.

(*Id*.)

6

In Reich's 2004 year-end PMP evaluation, Fine again rated Reich's performance "At Expectations." (Parliman Cert., Exh. J.)  The evaluation identified many of the same weaknesses and reiterated many of the same recommendations as the mid-year performance evaluation.  (*Id.*)  For example, Fine wrote: "Going forward, [Reich] needs to seek out and generate scientific and technical opportunities for collaboration on a consistent basis."  (*Id.* at 5.)  Further, Fine observed that while Reich was "receptive to new ideas and ways to improve experimental protocols[,] . . . she did not consistently generate these concepts and advance them herself."  (*Id.*)

> Pia's AE rating for 2004 is based on the fact that while her technical efforts were impressive, she does not consistently generate scientific ideas and pursue them in a proactive manner to drive decision-making, and has not developed consistent and unambiguous relationships which [sic] colleagues which would enhance the value of her efforts.  These concerns were indicated in the mid-year PMP review and have been emphasized throughout this form as well . . . .
>
> For 2005, Pia will be asked to focus her efforts on ensuring that she consistently initiates testable concepts which have the capability of enhancing timely decision-making within the program with which she is involved, and that she follows through on these concepts . . . .

(*Id.* at 7.)

Reich again expressed her strong disagreement with Fine's AE rating in the "colleague summary comments" column of the PMP.  (*Id.*)  Notwithstanding, when deposed she testified that her age did not factor into Fine's reviews:

> Q. . . . In 2004, did he treat you different or less favorably because of your age?
> A.  I don't think so.  I don't think so.

(Reich Dep. 94:2-5.)

In early 2005, Schering implemented yet another company-wide employee evaluation system, entitled the Global Scientific Professional Pathway ("Scientific Pathway"), which was published on an internal website accessible to all Schering employees.  (Burley Dep. 16:6-16.)

Whereas the PMP, emphasized employees' technical contributions, the Scientific Pathway focused primarily on employees' leadership skills.

All scientists were now assessed to determine if they were at a level and in a position consistent with their actual responsibilities.  Human Resources published a guidelines chart describing each of the scientific positions at the company with corresponding expectations and qualifications for each position   (Burley Cert., Exh. D.)  Most relevant to this case, the Scientific Pathway chart described the following positions:

> *Senior Scientist:*   Designs, executes and interprets complex laboratory experiments with broad priorities set by supervisor.  Originates research ideas. May participate on project teams, providing scientific expertise.
>
> *Associate Principal Scientist:*   Independently applies scientific and/or cross-functional knowledge to achieve project goals by the following actions: Completes technical assignments by designing, executing and interpreting complex experiments.  Suggests new areas for development.  Presents his or her own original ideas and research findings.  Applies diverse scientific knowledge to assignments.  May participate on cross-functional teams.
>
> *Principal Scientist:*   Provides technical/scientific and or regulatory leadership within department and serves as department representative through the following actions:  Identifies and resolves technical project issues.  Represents functional area at project team meetings.  Presents functional areas issues and solutions. Directs technical work encompassing several aspects of a project.

(*Id.*)

Principal scientists, like Reich, were expected to, among other things: provide technical/scientific leadership, establish cross-functional communication, and drive department results.  In contrast, lower-level scientists, such as senior scientists, were expected to focus on more technical contributions.  There was a general understanding throughout the company that the expectation of principal scientists was higher under the Scientific Pathway.  (Fine Dep. 63:17-23, 80:11-81:11, 83:8-85:8; Narula Dep. 68:21-69:22.)

According to Fine's deposition, in or around April 2005, SPRI managers, including Fine, evaluated employees based on the Scientific Pathway criteria.  (Fine Dep. 55:15-59.)  These evaluations were completed on a preprinted Human Resources colleague assessment form.  (Parliman Cert., Exhs. W, X.)  Based upon his evaluation, Fine concluded that Reich was performing at the level of an associate principal scientist.  (Fine Dep. 61:5-7.)  With respect to certain job performance criteria, such as "creativity and innovation" and "market intelligence," Fine assessed Reich as performing at the level of a senior scientist—two levels lower.  (Parliman Cert., Exhs. W, X.)

Fine provided Reich with verbal and written feedback throughout 2005.  Fine states in his deposition that he recommended Reich as co-chair of a research group in an effort to give her a platform for generating scientific ideas and developing her cross-functional teamwork.  (Fine Dep. 68:25-72:6).  Fine did not feel as though Reich's performance was improving, and on May 26, 2005, one day after he and Reich had a one-on-one meeting to discuss her performance, he issued a performance memorandum outlining the continuing performance problems.  (Parliman Cert., Exh. K.)  The memo identified concerns about:  (1) Reich's "ability to consistently identify and resolve critical scientific issues in a timely fashion[,]" (2) her "ability to develop and maintain open lines of communication[,]" and (3) her repeated "difficulties meeting [Fine's] timelines on administrative issues."  (*Id.*)

Pertaining to issue (1), Fine provided a bullet-point list of problem areas:

- Not coming to this week's S1P1 group meeting prepared to discuss biology issues and plans, despite the fact that you are the team's biology coordinator

- Not proactively following through to identify in vitro cell-based approaches to support S1P1 efforts, despite an acknowledged need for such assays by the team

9

- Not consistently providing meaningful input into discussions related to dose selection for the in vivo models for which you are responsible

- Limited overall contributions to project discussions at departmental and team meetings

(*Id*.)  Fine's memo reiterated the expectations of a scientist in Reich's position:

> As we have previously discussed, and as indicated in the Global Scientific Professional Pathways, a Principal Scientist is expected to consistently provide scientific leadership, identify critical scientific issues and create plans to resolve them, and to be open to suggestions and change.

(*Id*.)

According to Fine, what he expressed in the memo was the culmination of Reich's continued resistance to feedback and her failure to rectify the weaknesses he repeatedly communicated to her.  (Fine Dep. 110:9-111:14.)  According to Reich, at the May 25, 2005 meeting and in the May 26 memo, Fine verbalized an intention to demote her because of her age.  Reich states that Fine said in the meeting that there were too many "senior scientists" in his group and that he had tried to demote her.  (Reich Dep. 134:10-136:6.)

> Q. When he said to you "we have too many senior scientists," what did you understand him to mean by senior scientists?
> A. I'm not a senior scientist.  I'm a senior became I'm an older person.  There are people who are called senior scientists.  I'm a principal scientist.  So when he's calling me a senior scientist, he's calling me a senior citizen.
> Q. That's what you thought?
> A. Yes.
> Q. So you thought senior was a reference to your age?
> A. Absolutely.
> Q. And having nothing to do with your experience level and salary level?
> A. I was a principal scientist.  Loretta Bober was a senior scientist.  Why would he call me a senior scientist if it had nothing to do with age?
> Q. So you are satisfied when he said senior scientists, he meant old scientist?
> A. Absolutely.

(*Id.* at 135:7-136-3.)

Reich states that this conversation was the first time Fine had ever expressed any dissatisfaction with her performance.  She recalls the incident as follows:

> In 2005, everything changed when Dr. Fine told me that he had – he never had any complaints about my performance.  Everything was fine.  And then we had weekly meetings and I came into his weekly meetings and he told me that in re-evaluation of the department, he specifically had been told that he had too many senior scientists in his group, and he said, Pia, he said, "I tried to demote you," and I was just shocked.  This was the first ever I had heard that he was not pleased with my performance.  And he said, "I sent it up to have you demoted and it went all the way up to Cecil Pickett, and he said that you can't demote people who have good ratings."  And that was the first I heard of any dissatisfaction that Jay Fine had with me.

(*Id.* at 95:1-16.)

For her 2005 mid-year PMP, which covered the January through June of that year, Reich received a "Below Expectations" rating—the lowest directional rating to date.  (Parliman Cert., Exh. M.)  Fine met with Reich to discuss the PMP on August 18, 2005, and he again reiterated his issues with several performance areas, such as cross-functional teamwork and leadership. (*Id.* at 11.)

Reich received another "Below Expectations" rating for the 2005 year-end PMP. (Parliman Cert., Exh. N.) Fine again noted the same deficiencies in Reich's performance, including her lack of scientific insight, ideas and leadership, her inconsistent collaboration and communication with colleagues, and shortcomings in her overall job responsibilities.  (*Id.* at 1-15.)

> Pia missed significant opportunities to proactively identify and develop an experimental approach to implement the studies listed as the first accomplishment . . . in a manner commensurate with a Principal Scientist . . . .
>
> [A]s biology coordinator for the S1P1 team, Pia did not meet the expectations for her position in that she did not consistently identify scientific opportunities to further the understanding of the biology of this target.  For example, Pia was not consistent in her recognition of the necessity of reporting the cellularity of

relevant leukocyte populations in peripheral blood, instead focusing on population percentages in her data analysis, despite feedback from several individuals.  This hindered data interpretation and the generation of conclusions, and the possibility of additional progress.

Pia continues to be an enthusiastic participant and is motivated to contribute to team success.  However, as indicated elsewhere in this document, while some incremental improvements have been noted, Pia has *not* consistently met expectations with regard to shared accountability and leadership in several regards.  *Rather, her accountability has resulted almost exclusively through her technical contributions.*

(*Id.* at 2, 4, 9) (emphasis added.)

In his deposition, Narula explained why Reich's performance reviews under Fine's supervision were lower than under Zavodny's:

Q. Well, did you think it was odd that Dr. Zavodny was apparently pleased with Dr. Reich's performance, and then Dr. Fine apparently was not?
A. There was a very marked transition in the company's method of really looking at an employee's performance, plus the establishment of the Scientific Pathway, and so the bar was very high now, and every employee's performance now was being appraised according to the paradigm being put forward by the company, so they [sic] were different expectations.

(Narula Dep. 34:21-35:7.)

Due to Reich's continuing low performance ratings, Fine notified Reich in a memorandum, dated March 2, 2006, that she was being placed on a three-month Performance Improvement Program (PIP).  (Parliman Cert., Exh. O.)  Schering's Performance and Conduct Management policy stated that: "[I]f, despite coaching and counseling, the employee has failed to improve his/her performance," a PIP may be appropriate.  (Burley Cert., Exh. A at 5.)

Fine's memo, acknowledged and signed by Reich on March 6, stated that Reich had "not consistently performed at the expectations" of her position, and then detailed three areas of weakness:  cross-functional scientific leadership, written and oral communication skills, and

12

accountability for meeting timelines.  (Parliman Cert., Exh. O at 1.)  Fine provided specific

examples of Reich's "failure to meet expectations in these areas." (*Id.* at 2.)

Fine's memo set out an "action plan" of steps that Reich was required to take to meet the

expectations of her position.  (*Id.* at 2-3.)  Fine explained that one of Reich's responsibilities as a

principal scientist was "the identification of new molecular targets and the development and

implementation of the experimental validation strategies to support their progression and follow-

up."  (*Id.* at 2.)  In that regard, Fine proposed a detailed project for Reich involving inosine

monophosphate dehydrogenase (IMPD) as a potential new molecular target.  (*Id.*)  The memo's

action plan was as follows:

> 1. Within 30 days of the initiation of this PIP, define a strategy for in-house
>    evaluation of IMPD.
> 2. Within two months of initiation of this PIP, you must prepare a new target
>    background document for this project.
> 3. Within three months of the initiation of this PIP, present the results from the
>    above at the Inflammation department staff meeting.

(*Id.* at 2-3.)

The memo concluded with a discussion of the consequences should Reich fail to meet

these objectives:  "Failure to take the required action to improve your performance will result in

more severe action, which may include termination of your employment."  (*Id.* at 3.)  Reich

acknowledged having had a discussion with Fine and Susan Chang-Johnson ("Johnson"), Human

Resources Consultant, regarding the contents of the PIP, and receiving a copy of the memo.  (*Id.*)

On May 30, 2006, near the end of Reich's three-month PIP, Fine wrote another

memorandum to Reich, this one following up on Reich's PIP and reinforcing the feedback he

had already provided both verbally and in writing.  (Parliman Cert., Exh. P.)  Fine reiterated that

Reich was performing "the technical aspects of [her] responsibilities diligently[,]" and that she had improved in meeting timelines.  (*Id.* at 1.)  However, Fine continued:

> Notwithstanding the above improvements in some areas of your performance, you have continued to fail to meet expectations in the following essential areas of responsibility:  demonstrating cross-functional scientific leadership, maintaining precision with regard to your written and oral communications, recognizing scientific opportunities and identify scientific issues, and developing solutions to address these issues in a manner commensurate with the position of Principal Scientist.  Your contributions continue to result nearly exclusively from your group's technical output . . . .

(*Id.* at 1-2.)

The memo further stated that, given the delay in Reich's making the presentation called for in the action plan, her PIP was being extended to June 23.  (*Id.* at 2.)  Just as he had in his last memo, Fine concluded this memo by writing:  "[F]ailure to immediately improve your performance and sustain such improvement will result in more severe action, which may include termination of your employment."  (*Id.*)

On June 1, 2006, two days after Fine wrote that last memorandum, Reich filed a discrimination complaint with the New Jersey Division of Civil Rights (the "Division Complaint").  (Reich Dep. 223:22-224:2.)  On the same day, she attempted to contact Sylvester Mendoza ("Mendoza"), Director of Diversity and Equal Employment Opportunity ("EEO") at Schering, via e-mail.  (Parliman Cert., Exh. Q.)  Paul Graves, job position at Schering unknown, responded, telling Reich that Mendoza would be out of the office until June 5.  Graves gave her Mendoza's telephone number.  (*Id.*)  Reich states in her deposition that she never followed up with Mendoza, Graves, or anyone else.  (Reich Dep. 230:25-231:1.)

In her deposition, Reich states that she gave a copy of the Division Complaint to Johnson.  (*Id.* at 232:1-4.)  According to Johnson, however, the document Reich provided was only a

summary of her allegations, not the actual Division Complaint.   (Johnson Dep. 38:25-39:5.)

Reich stated that she took no further action:

> Q. Other than providing Susan Johnson with a copy of the complaint that you
> filed with the Division of Civil Rights, did you ever make an internal complaint
> with human resources or EEO at Schering about discrimination?
> A. No, I don't think so.

(Reich Dep. 231:20-25.)

Despite the filing of the Division Complaint, Reich's PIP presentation proceeded as

scheduled on June 22, 2006.  (*Id.* at 223:22-224:2.)  Afterwards, Fine wrote a memo to be placed

on file:

> Overall, Pia gave a broad presentation on this topic and did not effectively drill
> down to the essential issues which she and I had discussed.  Specifically, she did
> not effectively convey to the group: 1) the biological rational for pursuing an
> IMPDH II inhibitor; 2) potential plans for validating IMPDH II as a target; and 3)
> avenues for screening for IMPDH II-selective inhibitors . . . .
>
> In summary, Pia did not meet expectations with regard to scientific analysis, and
> the identification of scientific issues and approaches to resolving these.

(Parliman Cert., Exh. CC.)

The following day, on June 23, Fine, Narula, and members of Human Resources,

including Burley, and the legal department met and made the decision to terminate Reich.  (Fine

Dep. 146:18-151:7.)  On June 27, Fine and Burley told Reich that Schering was terminating her

employment.  (Reich Dep. 196:2-18.)

## III.   STANDARD OF REVIEW

Pursuant to Rule 56(c), a court should grant summary judgment "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

In evaluating the evidence, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).  For purposes of ruling on a motion for summary judgment, deposition testimony and affidavits, if not contradicted by other evidence, "may be accepted as true . . . without an assessment of the credibility of the witness." *Waskovich v. Morgano*, 2 F.3d 1292, 1296 (3d Cir. 1993) (quoting *Hancock Industries v. Schaeffer*, 811 F.2d 225, 230-31 (3d Cir. 1987)); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

As the Third Circuit first drew the analogy in *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990), and then reiterated it in *Abramson v. William Paterson College*, 260 F.3d 265, 277 (3d Cir. 2001), "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."

IV.  **DISCUSSION**

  A.  *Legal Standard*

It is common knowledge that the ADEA, which makes it unlawful for an employer to discriminate against an employee on the basis of age, was modeled after Title VII of the Civil Rights Act of 1964, and that the two statutes share the common purpose of eliminating workplace discrimination.   The Supreme Court has long held that the ADEA and Title VII should be construed under the same legal analytical framework.  *See Oscar Mayer & Co. v.*

*Evans*, 441 U.S. 750, 755 (1979).  Parallel to examining the validity of a Title VII claim, the Supreme Court and the Third Circuit have expressly directed that the disparate treatment theory applied in Title VII claims should be adopted in ADEA claims.  *See, e.g.*, *Reeves*, 530 U.S. at 140 (citing *O'Conner v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)); *Rodriguez v. Taylor*, 569 F.2d 1231, 1239-40 (3d Cir. 1977), *cert. denied*, 436 U.S. 913 (1978). In the absence of explicit discrimination, such as a facially discriminatory policy, the *McDonnell Douglas* burden-shifting analysis provides a paradigm for analyzing Title VII employment discrimination claims.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the three-step *McDonnell Douglas* paradigm, the plaintiff-employee bears the initial burden of establishing a *prima facie* case of discrimination.  *Id.* at 801-04.  Plaintiff must show that she: (1) is a member of a protected class, (2) was qualified for the position she held, (3) was fired from that position, and (4) suffered adverse action under circumstances that give rise to an inference of discrimination.  *Johnson v. St. Luke's Hosp.*, 307 Fed. App'x. 670, 671-72 (3d Cir. 2009) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)).

The second step of the *McDonnell Douglas* analysis shifts the burden of production to the defendant-employer to offer some legitimate non-discriminatory justification in response. *McDonnell Douglas*, 411 U.S. at 802; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  The ADEA offers two justifications: (1) "age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business[,]" and (2) "the differentiation is based on reasonable factors other than age."  29 U.S.C. § 623(f)(1).  Crucial to this step is that the employer need not prove that the proffered justification *actually* motivated its decision.  *Fuentes*, 32 F.3d at 763 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 256 (1981)).

17

If the defendant-employer can provide a legitimate basis for the adverse employment decision, the burden shifts back to the plaintiff-employee to demonstrate pretext.  This is the third step of the *McDonnell Douglas* analysis—and the ultimate means of defeating a motion for summary judgment—and it requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.  A plaintiff will survive summary judgment if she can produce evidence sufficient "to meaningfully throw into question" the employer's reason for the allegedly discriminatory action.  *Id.* at 765.

While the plaintiff is not required to "adduce evidence directly contradicting the defendant's proffered legitimate explanations" at the summary judgment stage, she may not merely strike down the defendant's reasons without explanation.  *McDonnell Douglas*, 411 U.S. at 804.  Instead, the plaintiff must point to specific "weaknesses implausibilities, inconsistencies, [or] contradictions[,]" providing sound reasons for why a reasonable factfinder could find them "'unworthy of credence."  *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)).  It is "not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus."  *Abramson*, 260 F.3d at 283.

### B. *Analysis*

#### i. *Prima Facie Claims*

##### a. *Discrimination*

18

As discussed above, see Part VI.A., Reich must first establish a *prima facie* case of discrimination.  Regarding the protected class element, the ADEA qualifies protected individuals as those who are at least 40 years of age.  29 U.S.C. § 631(a).  It is undisputed that Reich satisfies the statutory requirement, because at all times at issue in this case, she was a member of the class protected by the ADEA.  Schering hired Reich when she was 55 years-old, and Reich's employment was terminated when she was 62 years-old.

Turning to element two, Reich must demonstrate that she was qualified for the position she held.  In 1986, Reich earned her Ph.D. from Rutgers University, Department of Physiology and Zoology, Section of Immunology and Endocrinology.  (Compl. ¶ 7.)  Reich's experiences in the scientific field are reflected in the record.  (Reich Dep. 40:2-52:2.)  While the parties dispute *how* qualified Reich is, viewing the facts in the light most favorable to her, the Court finds established evidence of the requisite degree of education, training, and skill to fit the position for which she was hired.

Element three does not warrant discussion, because Reich was indeed fired.  Similarly, Reich satisfies element four because there is sufficient evidence to permit the inference of discrimination on the basis of age.  The Court is satisfied that Reich has established a *prima facie* claim of discrimination.

### b. *Prima Facie Claim of Retaliatory Termination*

Reich's claim of retaliation requires a different analysis, namely that she establish that: (1) she engaged in protected activity; (2) defendants were aware of that protected activity; (3) defendants took some adverse action against her; and (4) "circumstances were sufficient to

permit the inference that the protected activity was a contributing factor for the adverse action." *Hasan v. U.S. Dep't of Labor*, 545 F.3d 248, 251 (3d Cir. 2008).

Reich engaged in a protected activity when she filed the Division Complaint on June 2, 2006.  Viewing the facts in a light most favorable to Reich, Schering was aware of this protected activity because Reich gave a copy of the complaint to Johnson in Human Resources.  (Reich Dep. 232:1-4.)  Reich admits that she did not make an internal complaint with Human Resources or the EEO office at Schering about the alleged discrimination.  (*Id.* at 231:20-25.)

Reich satisfies the third prong because she was terminated.  Finally, regarding the fourth factor, there is sufficient evidence to permit the inference that Reich's filing of the Division Complaint was a factor in Schering's decision to terminate her employment.  At the summary judgment stage, Reich has succeeded in establishing a *prima facie* case of retaliation.

### ii.  Schering's Proffered Reason for Terminating Reich

Schering has met its "relatively light burden" by articulating a legitimate reason for its decision to terminate Reich's employment in June 2006.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  At the summary judgment stage, it is not incumbent upon Schering to prove that the proffered justification "*actually* motivated its behavior," but rather that, taken as true, the evidence "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2747 (1993).

In the previous section on the facts, the Court set forth a detailed history of Reich's dealings with her supervisor, Fine, who participated in the decision to fire her.  Those facts, which are in the main not in dispute, document Schering's articulated reasons.  Beginning with

20

Reich's first evaluation under the PMP—the 2004 mid-year review—Fine noted deficiencies in Reich's performance.  Reich received a satisfactory "At Expectations" directional rating for the 2004 mid-year PMP review, and again for her 2004 year-end PMP evaluation.  Fine noted that Reich failed to "generate scientific ideas and pursue them in a proactive manner to drive decision-making[,]" her need to "strengthen[] her teamwork and collaborative skills[,]" and her need to demonstrate "leader behaviors[.]"  (Parliman Cert., Exhs. S, J, V).

In 2005, Schering instituted the Scientific Pathway, a program intended to raise the bar for employee achievement and expectations.  Throughout 2005, Fine continued to communicate, both verbally and in writing, to Reich that her performance needed to improve.  She received a "Below Expectations" directional rating for both her 2005 mid- and year-end PMP evaluations.  Fine's comments in the evaluations reiterated the same performance deficiencies that he had identified throughout 2004.

After two consecutive "Below Expectations" PMP ratings, one-on-one discussions between Fine and Reich, meetings involving Fine, Reich, Human Resources, and Narula, and memoranda correspondences, Schering placed Reich on a three-month PIP, consistent with its corporate policy.  Fine, Human Resources, and Narula were involved in the decision to place Reich on a PIP.

The PIP expressly notified Reich that failure to improve her performance would "result in more severe action, which may include termination . . . ."  At the time Reich was placed on the PIP, and afterwards, Fine told her which areas needed improvement to successfully complete the program.  Fine documented specific examples of where she fell short.

As indicated above, Reich was required to give a presentation at the end of the PIP.  On May 30, 2006, shortly before Reich's mandatory presentation was scheduled to take place, Fine

gave her formal written notice that the PIP period would be extended to the end of June.  Fine warned Reich again that failure to improve performance would result in more severe action, including possible termination.

Reich filed her complaint with the New Jersey Division of Civil Rights on June 1, two days after Fine's May 30 memo.  She went ahead with the presentation required by her PIP on June 23.  According to Fine, Reich was unable to effectively answer important questions and to fully evaluate the proposed target.

Schering's evidence documents two years of steady decline in performance, and continual communication with Reich about those areas in which her supervisors wanted improvement.  Taking Schering's proffered evidence as true, a reasonable jury could conclude that it had a nondiscriminatory basis for terminating Reich.

### iii.  Has Reich Adduced Evidence of Pretext?

As discussed in Part IV.A., Reich's evidence must "meaningfully throw into question" Schering's proffered reasons for firing her.  *Fuentes*, 32 F.3d at 764.  Put another way, she must demonstrate pretext.  Reich points to three statements made by Fine, and the fact that she filed the Division Complaint before she was terminated, as evidence of pretext.

Examining Fine's statements, the Court notes two of these remarks were not directed at Reich, and were made at least six years before she was terminated and before Fine was her supervisor.

*First remark:*

> Q. During the entire time that you knew Dr. Fine, whether before he became your supervisor or after, did he ever make any derogatory comments or statements to you about your age?
> A. No, not about my age.

22

Q. During the entire time that you knew Dr. Fine, whether before he supervised you or afterward, did you ever hear him make any derogatory comments or statements about any employee at Schering?

A. Yes.  There was another employee whose name was Ethan Grant, who was interviewing to replace Maria Weikowski's position in Jay Fine's group, and as we came down to our corridors, Jay, in the hallway, made the comment that, "Young and cute huh, ladies? What do you think about that, you think you would like to have him in the department?" . . . I was just shocked.

*Second remark:*

Q. Other than that one statement by Dr. Fine, did you ever hear him make any other derogatory comments or statements about the age of any other person or employee at Schering?

A. There was, early on Jay Fine and I were located right next to each other, and there were people interviewing and I've been thinking, I can't remember who the interviewers were, but…Jay Fine said, "Oh, you are talking about that old guy?" And this is going back, this is probably '99 or 2000.

. . .

Q. When Mr. Fine said that, what did you say to him?

A. I said, "Jay, you can't say that."

Q. And what did he say?

A. I think he just – he didn't say anything.  Nothing

Q.  Other than those two occasions you've now described, were there any other occasions where you heard Dr. Fine make a derogatory comment or statement about the age of another person or employee of Schering?

A. No.

(Reich Dep. 85:11-86:8, 88:18-89:5, 90:16-91:2.)

A plaintiff cannot demonstrate pretext by pointing to idle, stray remarks.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).  Mere proof of such remarks is an insufficient basis for finding that the plaintiff has satisfied her burden under the third step of the *McDonnell Douglass* framework.  *Warner v. FedEx Ground Package Sys.*, 129 Fed. Appx. 741, 745 (3d Cir. 2005); *see also Fuentes*, 32 F.3d at 767, *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 112 (3d Cir. 1997) (reasoning that while defendant's "alleged words

23

certainly could constitute evidence from which a reasonable factfinder could draw an inference of age-based animus, . . . these words alone could [not] reasonably be viewed as sufficient to prove by a preponderance of the evidence that age was a determinative cause of [plaintiff's] subsequent termination.")

This Court concludes that Fine's remarks fail to "meaningfully throw into question" Schering's reasons for terminating her employment. *Fuentes*, 32 F.3d at 765. They are about peripheral people, not directed at Reich, not made in the context of employment decision-making, and temporally remote. Reich fails to show any connection between her interactions with Fine and the remarks he made in completely unrelated contexts before he was her supervisor.

The third remark Reich offers as proof of age-based animus, which took place in May of 2005, fails to establish a pretext, but on different grounds. Again, as is required at the summary judgment stage, the facts shall be viewed in a light most favorable to the plaintiff and the Court will not engage in a credibility assessment. Nonetheless, Reich's characterization of Fine's comment that he had too many "senior scientists" in his group as an ageist remark is belied by the record. The record evidence establishes that "senior scientist" is a term of art used at Schering to refer to a specific position, and the term is unrelated to age. The Global Pathway chart defines a "senior scientist" as an employee who "[d]esigns, executes and interprets complex laboratory experiments with broad priorities set by supervisor[,] [o]riginates research ideas[,] [m]ay participate on project teams . . . ." The term was used in the same context as other scientific positions at Schering—namely, to differentiate between ranks in the hierarchy (e.g., scientist associate principal scientist, principal scientist, fellow, senior fellow, distinguished fellow).

When reviewing Reich's performance, Fine couched his feedback and criticism with respect to Reich's position as a "principal scientist."   For example, in a follow-up e-mail to Fine's 2004 mid-year PMP discussion with Reich, he wrote: "[I]t is expected that Principal Scientists such as Pia . . . ,"and in the performance memo written after Fine's 2005 mid-year PMP discussion, he again wrote "a Principal Scientist is expected to . . . ."  (See *supra* for more complete excerpts from memos.)

Although Reich was hired as a principal scientist, and not a senior scientist—a position two tiers below that of principal scientist—in or around April 2005, Fine assessed Reich as performing at the level of a senior scientist with respect to certain job performance criteria.  This assessment took place *prior* to Fine's alleged comment that there were too many senior scientists in his department.  Reich has chosen to attach age content to the term "senior," but she fails to adduce any proof that Fine or anyone else used the word as anything other than a modifier born of the ranking system.

Finally, Reich points to the Division Complaint as proof that Schering's proffered reasons are a pretext for age-based animus.  As earlier discussed, Reich filed it two days after Fine wrote a memo reiterating the fact that her employment was in jeopardy of termination. Although Schering argues that Reich preemptively filed the Division Complaint in anticipating of her termination, the Court is more persuaded by a different aspect of its timing:  she filed late in Fine's well-documented efforts to inform her that her performance was not meeting expectations.  The record is replete with evidence that, for a protracted period, Fine had been working with Reich to evaluate and improve her performance deficiencies.  The large quantity of memos and evaluations he wrote are full of scientifically based observations, none of which Reich throws into question.  As such, her delivery of the Division Complaint this late in the

process does not constitute a sufficient quantum of evidence of retaliation such that a reasonable juror could find in her favor.


V.    CONCLUSION

The Court concludes that Fine's statements are throw-away remarks, too remote in time and too *de minimis* to constitute direct or indirect evidence of age-based animus.  Based on evidence in the record, the Court rejects Reich's interpretation of the term "senior scientist" as ageist.  Taken as a whole, the evidence she has adduced is not sufficient to permit the inference of discrimination or retaliatory termination, and summary judgment is granted to the defendant. Reich's remaining claims for discrimination and retaliatory termination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, are also dismissed, pursuant to 28 U.S.C. § 1367(c)(3) (where a district court has dismissed all federal claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims).

Accordingly, the Court will grant defendant's motion for summary judgment.  An appropriate order will be entered.


/s/Katharine S. Hayden

Hon. Katharine S. Hayden